## KAPAROS et al. v. STATE

(No. 1810; November 14, 1933; 26 Pac. (2d) 533)

*T. S. Taliaferro, Jr.,* and *A. L. Taliaferro,* both of Rock Springs, for plaintiff in error.

The cause was submitted for defendant in error upon the brief of *Ray E. Lee,* Attorney General, *Oscar O. Natwick,* Deputy Attorney General and *William C. Snow,* Assistant Attorney General, all of Cheyenne, Wyoming.

BLUME, Justice.

The defendant was accused of murder in the first degree, committed at about ten o'clock on the evening of July 4, 1932, upon one George Stavroulakis. Accused with him was one Mike Zinwdikis. Defendant demanded a separate trial. This was granted. Zinwdikis was tried first and he was convicted of murder in the first degree without capital punishment. Defendant, too, was convicted of the same crime, and the same penalty was meted out to him. From a sentence in conformity with the verdict, the defendant has appealed.

1. The main assignment of error herein is that the verdict is not sustained by sufficient evidence. This will necessitate a review of the testimony. It is voluminous and we shall point out only the most salient points. Among the principal testimony is that of the defendant's alleged accomplice, Mike Zindwdikis. The latter lived at Winton, some distance from Rock Springs; the defendant lived at Rock Springs. They appear to be second cousins. Zinwdikis' testimony is quite lengthy, and at times somewhat confusing as to just when certain things were said or done. The meaning of his testimony, too, is, at times, somewhat difficult to gather. We shall give the most outstanding points of his testimony, as we understand it, in direct narrative form, and this is as follows:

In the month of April, 1932, Mike Kaparos sent word to me several times for me to come to Rock Springs, reporting that he was sick. I finally complied with his request and saw him. He was bruised up considerably and had a black eye. He told me

that he had had trouble with Charles Milonis and the deceased; that Milonis beat him up while Stavroulakis held him. He stated that he would take his revenge; that after the trouble the deceased had come to his house to excuse himself, but that he, Kaparos, had tried to get out of his bed "to catch the knife to cut the head off and throw out." I chided Kaparos for getting into trouble, adjured him to give up his idea of revenge, and he promised to do so. After about ten days, I again came to Rock Springs and saw Kaparos. He again spoke of his trouble, and then stated that he would send both Milonis and the deceased to "Rogan's ranch" (Rogan has a funeral parlor at Rock Springs.) I again saw Kaparos some fifteen days after that, and he then asked me if I were coming to Rock Springs on July 4th; if so, for me to bring in my gun—a Luger—; that he wanted to use it, to revenge himself; that his own gun was no good. I told him "nobody was going to use my gun." I went to Rock Springs on July 3rd, 1932, carrying my gun with me. I left it at the house of defendant. In the afternoon, as well as the evening of that day, defendant urged me to stir up a fight with the deceased, which I refused to do. On that day and later, he spoke of having money—about a thousand dollars, which we could take, after the killing, and go away on. On the night of the third, I played "barbutti" all night, which is played with dice. I saw Kaparos the next morning. I said that I intended to play some more "barbutti" that day, and he again urged me to stir up a fight with the deceased. During the day I played at the O. K. Soft Drink Parlor. Many were playing, among them the deceased. Before I started, Kaparos called me over to where he was and said "now is a good time to start trouble," and I said "I don't

want to start trouble." Defendant apparently then left. During the game a man from Reliance threw the dice "crooked," and I said "that's no dice," but everybody said that's dice, and so I said that if everybody say it's dice, it is so, and I pay. But I said that "everbody was colored," because "white men" would not tell a lie. The deceased thereupon said that there were others more white than I. I indicated that there might be trouble, and that some one might get killed, without naming anybody. The deceased told me that I couldn't kill anybody, that I had no "guts," and I said to deceased: "Well George, if anybody would like to see whether I have guts, try me some time at some place." The game lasted until about five or six o'clock. I then went to Kaparos' house, where I saw him. We soon thereafter went to the neighboring house of Mike Varonis, but before going, Kaparos handed me my gun, saying to take it along, which I did. He took his own gun and put it in his pocket. From then and until about fifteen or twenty minutes after nine o'clock, Varonis, Pete Pikakis, defendant and myself were together, drinking wine, and we became somewhat intoxicated. All of us then went out, to go to town. When we came to K street, Varonis and Pete Pikakis had preceded us. Kaparos again commenced to talk of killing Milonis and the deceased, asked me to help him, said I did not love him, etc. I finally said that I would help him and asked him if he had his money with him; he said he did, and I said "let's go." Kaparos wanted to go to Milonis' house first, to kill him. But about that time, we saw the deceased on K street, on the same side that we were on. Kaparos said "there is the one," and I said "All right, keep still." The deceased crossed K street before we did; defendant was close behind him. Both

had crossed before me. I was held up somewhat by a passing car. When the deceased and Kaparos had crossed and had come close to a telephone post, in front of the O. K. Soft Drink Parlor, Kaparos took hold of the deceased, who asked "Mike, what do you want?" Defendant then called "Help, help," and I then shot the deceased in the back, seeing nothing more, and ran, but I think defendant went into the O. K. Soft Drink parlor. I ran down K street, Noble Drive, and finally toward the defendant's house, and found the defendant at home. I asked him if he had the money, and he said he had only a dollar and a half. He proposed that we next kill Charles Milonis, then go to Megeath, and if the sheriff came, to kill him, and then to kill ourselves. I was indignant, because he had no money, and finally went to Winton. I admit that I testified at my own trial, that the defendant and not I did the shooting. I did that to protect myself. I lied in that trial.

The witness Charles Milonis testified that the deceased roomed at his house; that about the middle of April, 1932, a number of men were there, including the deceased and the defendant; that some of the men began to wrestle, at first in a friendly way, winding up in a fight; that most of the men left toward dark. Later the witness and the deceased went out, and some one calling from the house that there was a drunk man in there, he went back and found the defendant. He tried to take him in a car, or walk along with him, but defendant kicked him and threw him down; that he, the witness, got up; that he choked defendant and hit him with a stick. The witness, however, further testified that the trouble was between himself and the defendant, and that the deceased had nothing to do with it.

Later that evening, after ten o'clock, defendant,

according to the testimony of Barbarigos, was found near the house of Milonis, bruised, black, dirty and bloody, and was taken home by Barbarigos. A few days thereafter, one Bartsules saw the defendant, as he testified, at the latter's home, and had a talk with him as to his condition and its cause; he told defendant that he could see, now, what wine would do, but the defendant answered that the wine had nothing to do with it; that he knew who did it, and that he would "fix him;" that the deceased had held him, while Milonis had taken a piece of pipe and had hit him over the head, and that thus, both of them together, had gotten him down.

On the night of the homicide, the witness Steve Denoff was walking along Fifth Street, turning thence onto K Street, and, according to his testimony, he saw the defendant and Zinwidikis about 9:45 to 10 o'clock p. m., when crossing Fifth street and going onto K street; that they crossed the latter street, going fast, and came to the O. K. Soft Drink Parlor; that he saw the deceased fall, near the telephone post; that the defendant thereupon ran into the front of the drink parlor, while Zinwidikis ran down on K street; that there was nobody else on that side of the street at that time; that he heard shots fired, but was unable to tell whether they came from a gun or firecrackers. The back part of the drink parlor reaches to Noble Drive, and a number of witnesses testified that they saw both the defendant as well as Zinwdikis running along that street, the latter some distance in front of the former. Some of the witnesses (boys) followed the defendant. They passed the house of Anton Poulos. Defendant was walking fast; he stopped to ask Poulos if he had seen Zinwdikis. A little later, the defendant stopped at the house of Gus Manatos, a witness in the case; defendant was

shaking, and had a gun with him, which he tried to have Manatos take and keep; he asked if witness had seen Mike Zinwdikis, saying that Zinwdikis had killed Stavroulakis, and he wanted the witness to go up town to see whether or not he was dead.

Defendant was arrested about 11 o'clock p. m. of July 4th. It was shown that at that time he denied that he had a gun, and asked that his trunk be searched. None was found in the trunk, but one was found right behind it. Defendant at that time, according to the testimony, stated that he had not been up town that day since about noon, and that he had gone to bed at eight o'clock. On July 6th, 1932, the defendant, while in jail, and in the presence of a number of witnesses, made the same statement as to having been up town, and denied that anyone had seen him running down the street on the night of July 4th.

The defendant was a witness in his own behalf. He denied that he had had any grudge against the deceased; but that, on the contrary, he was friendly with him, had eaten and drunk with him since the trouble with Milonis in April, and that he had made no threats against the deceased. He admitted having been with Kinwdikis on the evening of July 4th, and that he had his gun with him. He claimed that he c r o s s e d the street before Zinwdikis, went into the O. K. Soft Drink Parlor, took a smoke and was there for a little while, when some one came in, saying that Zinwdikis had shot the deceased; that he stayed in the drinking parlor a little while longer, and then became scared on account of the gun which he was carrying, thinking that the police, perhaps, might search the people in the drinking parlor, and that he went out by the back door and to the house of

Gus Manatos to leave his gun there. Pete Pitakis testified on behalf of the defendant and stated that Zinwdikis, on the afternoon of July 4th, after his barbutti game, was "mad," because his money was taken unjustly, and made threats of killing someone; that they all drank together that evening; that thereafter they went up town; that he and Varonis went into the O. K. Soft Drink parlor and ordered coffee, including a cup for the defendant; that the latter came in two or three minutes later, did not stop to drink his coffee, but disappeared; that a few minutes later some one else came in, stating that Zinwdikis had killed the deceased.

Counsel for the defendant assert, as already stated, that the evidence in this case is not sufficient on which to convict the defendant. Their main reliance is on the fact that, as they argue, the testimony of Zinwdikis was wholly incredible. It is true that his evidence is unsatisfactory on some points. He testified, for instance, that he tried to persuade the defendant to give up his ideas for revenge; later, when money was mentioned, he readily assented to give aid. He stated, when asked to bring his gun, that no one could use it. But he brought it. Asked to make trouble, he refused; but he made it, or at least threatened that he might make it. He asserted that defendant wanted him to bring his gun, because his, the defendant's was no good; but when the time came, defendant made no move to indicate that he wanted Zinwdikis' gun, but took his own. These things would seem to indicate that Zinwdikis was either weak-minded, or a knave; we cannot tell which. The story that defendant wanted to kill Charles Milonis before leaving, after Stavroulakis had been killed, and after defendant and Zinwdikis had both attempted to run to safety, is almost, if not entirely, incredible, un-

less, as asserted by the attorney general, defendant's mind was hardened beyond that which is found in the ordinary criminal.

Notwithstanding all this, we cannot, we think, in the light of the record before us, fairly say that the verdict is not sustained by substantial evidence. On the contrary, we think that it is sustained by ample evidence. The motive for the killing was not only shown by Zinwdikis, but also by the witness Bartaules and by other minor corroborating circumstances shown by the evidence. But we need not lay too much stress on that. Even if it were true that Zinwdikis, instead of the defendant, was the instigator of the homicide, there was, nevertheless, sufficient evidence, we think, to warrant the jury in finding that the defendant was a participant in the crime; that he aided and abetted it, and that it was committed purposely and with deliberation. The defendant had his gun with him at the same time Zinwdikis had his. It is almost impossible to explain that fact away. It shows a purpose, at the time of the commission of the crime, far from innocent. The jury were warranted, we think, in rejecting the defendant's explanation; nay, more, to find in that explanation a showing of guilt. He testified that he went into the O. K. Soft Drink parlor before the shooting. The contrary is shown by the witness Denoff, who, so far as we can tell from the record, was a fair and unbiased witness, and his testimony could well be taken by the jury as true. And if it is true, then, clearly, the jury could hardly in the absence of a satisfactory explanation, avoid drawing the conclusion—especially in view of the relationship of defendant to Zinwdikis, and in view of the fact that the defendant had a gun, and in view of the other evidence in the case—that the defendant was implicated in the crime. They evi-

dently found that no satisfactory explanation had been given, and we think that their finding is justified. Defendant testified that he went into the Drink Parlor and took a smoke; that he heard that Zinwdikis had killed the deceased; that he continued smoking. The jury did not believe him, and we cannot say that they were wrong. Zinwdikis was defendant's relative. The jury doubtless considered that his natural impulse would have been, if innocent, to rush instantly to the scene of the crime to inquire into the cause and the circumstances of the homicide and the condition of his cousin. But he did the contrary. He continued to smoke, as he claimed, and then left by the back door. The jury, no doubt, accepted the testimony that he ran. Why run, if innocent? Besides, Petakis, his friend and a witness in his behalf, gave damaging testimony against him. For, though confirming the defendant in that the latter entered the Drink Parlor before the shooting, he testified that defendant, without lingering to drink the cup of coffee ordered for him, went out before anyone came in to announce that the decedent had been shot by Zinwdikis, thus contradicting the defendant's testimony in this respect. The jury were not compelled to accept the theory that this conduct of the defendant was consistent with innocence. They had, further, the right to consider that the defendant lied about his gun and about his running away from the scene of the homicide. We think, accordingly, that the verdict is sustained by substantial evidence.

2. The defendant assigns as error the giving of instruction numbered twenty-five, which, in part, is as follows:

"If you reject the evidence given by the witness Mike Zinwdikis as not being corroborated and as

being untrue or unworthy of belief, then the evidence against the defendant is circumstantial, and the court instructs the jury as a matter of law that where a conviction for a criminal offense is sought upon the circumstantial evidence of the case alone, the State must show beyond all reasonable doubt that the alleged facts and circumstances are true."

The instruction then continues at length, stating the caution which the jury should exercise in such case and relating what usually is told the jury in such cases in connection with circumstantial evidence. Counsel for the defendant complain that in the quoted part of the instruction, the court assumed that if Zinwdikis' testimony were rejected, there would be circumstantial evidence against the defendant, and that his assumption was prejudicial error. It may be that it would have been more cautious if the court had inserted the clause "if any," after the words "then the evidence against the defendant." But we do not believe that the failure to do so was prejudicial error. For, taking the instruction as a whole, we do not believe that it can be fairly said that the court invaded the province of the jury by assuming the existence of circumstantial evidence—if it can be said that such assumption would be error in face of the record before us. The court specifically told the jury that it was their duty to determine what facts and circumstances were established, thus certainly negativing any assumption on the part of the court; and more than that, he told them that they must find the facts and circumstances, if alone relied on for conviction, to be true beyond a reasonable doubt, and that the facts as a whole were inconsistent with any other reasonable conclusion than that of the guilt of the defendant. We think that the jury clearly understood that it was their exclusive function to find, under the hypothesis of this instruction,

as to whether, or what, facts and circumstances of guilt were shown by the evidence. Counsel also argue that there was no circumstanial evidence in the case, as they understand the term. It would seem that all the evidence,—aside from that furnished by Zinwdikis, was circumstantial. It may be that some of it—for instance, the testimony of Denoff—should be considered as direct evidence. But if that is true, then the instruction of the court was favorable to defendant rather than unfavorable; and he had no cause to complain.

3. The defendant also assigns as error the giving of a portion of instruction numbered twenty-six. That instruction first told the jury that Zinwdikis was an accomplice in the crime. It then proceeds almost in the identical language used in the instruction considered by this court in State v. Beish, 32 Wyo. 136, on page 140, 230 Pac. 678, including the following language:

"The jury should always act on such testimony with great care and caution, and should subject it to a careful examination in the light of all the other evidence in the case; and the jury should not convict upon such testimony alone, unless after careful examination of such testimony you are satisfied beyond a reasonable doubt of its truth."

The instruction then concludes:

"You are further instructed that the term 'corroborated' as used in this Instruction, means other and creditable evidence in addition to the testimony of the witness, Mike Zinwdikis, tending to connect the defendant with perpetrating the homicide, and with the shooting and killing of the deceased; such corroboration to be competent and sufficient, must tend to confirm the testimony of the accomplice, Mike Zinwdikis, upon a point material to the issue in the sense that it tends to prove the guilt of the defendant. And if you find that any part of the

testimony of the witness, Mike Zinwdikis, is not so corroborated by other evidence, which you believe to be true, you should reject that part of the testimony of the said witness, Mike Zinwdikis, which is uncorroborated, *unless you are satisfied beyond all reasonable doubt of its truth."*

The instruction as a whole is substantially like instruction A offered by defendant himself, except that the court added the last clause, in italics. Counsel complain of this modification. But that modification merely applied the same rule to a **part** of the testimony, not corroborated, which was applied to the testimony as a whole, and hence cannot be said to have been prejudicially erroneous.

Finding no reversible error in the record, the judgment of the trial court must be affirmed. It is so ordered.

*Affirmed.*

KIMBALL, Ch., J., and RINER, J., concur.